# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Andy LeRoy Elwood,<br><br>                    Plaintiff,<br><br>     v.<br><br>Carolyn Colvin, Acting Commissioner of Social Security,<br><br>                    Defendant. | Case No. 13-cv-3645 (JRT/HB)<br><br><br>**REPORT AND RECOMMENDATION** |

Carol Louise Lewis, Attorney at Law, 14 North 7th Avenue, St. Cloud, MN 56303, for Plaintiff Andy LeRoy Elwood

Ana H. Voss and Ann M. Bildtsen, United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415, for Defendant Carolyn Colvin

HILDY BOWBEER, United States Magistrate Judge

Plaintiff Andy LeRoy Elwood filed for disability insurance benefits (DIB), alleging he was disabled due to chronic pain, ruptured discs, depression, post-traumatic stress disorder (PTSD), an alcohol disorder, and migraines.  After a hearing before an administrative law judge (ALJ), Elwood's application was denied.  The Appeals Council denied review, and Elwood sought judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).  The matter is now before the Court on the parties' cross-motions for summary judgment, which were referred for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and District of Minnesota Local

Rule 72.1.  For the reasons set forth below, the Court recommends that Elwood's motion be denied and the Commissioner's motion be granted.

## I.      Background

### A.      Procedural Background

Elwood filed an application for DIB on September 7, 2010, alleging a disability onset date of June 30, 1995.  (R. 74, 235.)[1]  His alleged medical conditions included chronic pain, ruptured discs, depression, PTSD, an alcohol disorder, and migraines. (R. 239.)  Elwood was last insured on September 30, 2001, and he was forty-one years old at that time.  (R. 20.)  After Elwood's application was denied initially and on reconsideration, he requested a hearing before an ALJ.  (R. 74, 75, 85.)  Elwood and his wife attended and testified at the resultant hearing, as did vocational expert Norman Mastbaum.  (R. 31.)

The ALJ issued an unfavorable decision on September 19, 2012, concluding that Elwood was not disabled from June 30, 1995, through September 30, 2001.  (R. 9, 12.) Elwood filed a request for review of the ALJ's decision with the Appeals Council, which denied the request on October 31, 2013.  (R. 1, 7.)  The ALJ's decision thus became the final decision of the Commissioner.  (R. 1.)

### B.      Medical Records

Elwood alleges a disability onset date of June 30, 1995, and he was last insured on September 30, 2001.  The Court limits its consideration of medical records to those

---

[1]  The Administrative Record ("R.") is located at Docket Nos. 9 and 10.

relevant to this timeframe.  *See Dipple v. Astrue*, 601 F.3d 833, 834 (8th Cir. 2010).  The Court further limits its consideration of medical records to those relevant to Elwood's physical impairments, because he is not challenging the ALJ's evaluation of his mental impairments.

In March 1995, Dr. Jeffrey Dick performed an L4-5 discectomy and anterior spinal fusion to improve Elwood's "significant symptoms of low back pain."  (R. 359.) Within a few months, Elwood was able to walk up to six miles a day, and he rated his pain as a three on a ten-point scale.  (R. 439.)  Elwood's pain was well-managed until he was involved in a motor vehicle accident on June 17, 1996, which caused soreness, neck pain, headaches, severe low back pain, and left leg pain.  (R. 432, 511, 513, 693.)  From x-rays and a CT scan, Dr. Dick concluded that the spinal fusion remained solid and that Elwood had simply pulled some muscles.  (R. 432, 513.)  A week after the accident, Elwood rated his pain as an eight on a ten-point scale, but said that the pain improved with walking and that he tried to walk a mile-and-a-half every day.  (R. 432.)  Elwood's physical therapist noted tightness, limited range of motion, and tenderness in the lower back and shoulders.  (R. 432-33.)

By July 19, 1996, Elwood was "slowly improving," although his back remained sore and his neck continued "to bother him."  (R. 514.)  His treating physician, Dr. Robert Rafferty, diagnosed "acute neck and back strain."  (*Id.*)  A month later, Dr. Rafferty described Elwood as "slipping" and "getting really cranky."  (R. 515.) Elwood said he could not sleep or turn his head, and he was constantly in pain.  (*Id.*) Prescription medications, injections, chiropractic treatment, and physical therapy were

not effective, and Dr. Rafferty felt "at a loss as to what more to do medically." (R. 515-17.)

At Dr. Rafferty's recommendation, Elwood began a chronic pain rehabilitation program in November 1996. (R. 693.) During a physical examination, Dr. Thomas Balfanz found Elwood's spinal range of motion mildly impaired and his spinal region mildly or minimally tender. (R. 694.) Straight-leg-raising tests were unremarkable. (R. 695.) Lower and upper extremity strength was a five on a five-point scale, with the exception of the left deltoid, biceps, and triceps, which were a four. (*Id.*) Elwood's gait was normal. (*Id.*) Recent MRI and CT scans and an electromyography study were normal. (*Id.*) Dr. Balfanz felt that most of Elwood's symptoms were myofascial, and he recommended a program of physical and occupational therapy, biofeedback, and counseling. (*Id.*)

In December 1996, Elwood told his occupational therapist at the pain clinic that he could walk ten to fifteen minutes at a time, reach without limitation, carry fifteen pounds for twenty feet, care for himself, perform light activities independently, and drive up to an hour at a time. (R. 706.) The following month, Elwood's pain rehabilitation counselor told Dr. Balfanz that Elwood was "after a quick fix and is not displaying great insight into the benefit of a pain rehab program." (R. 692.) Elwood completed the chronic pain rehabilitation program in March 1997. (R. 689.) At that time, he rated his pain as a six or seven on a ten-point scale. (*Id.*) Dr. Thomas Balfanz examined Elwood and noted a mildly impaired range of motion and mild tenderness, but no spasms. (*Id.*) He recommended discontinuation of the pain rehabilitation program, psychological

4

counseling, sleep medication, and a consultation with a neurosurgeon such as Dr. Dick. (R. 690.)

Dr. Rafferty saw Elwood in December 1997 "for insurance purposes and to document the progress or perhaps lack of progress." (R. 518.) Elwood reported continuing neck and back pain, for which he took four to eight Advil a day and six to eight Vicodin a week. (*Id.*) Dr. Rafferty did not physically examine Elwood. (*Id.*) In January 1998, Elwood reported to Dr. Rafferty "quite a bit of back and neck discomfort." (R. 523.) Advil and Excedrin upset his stomach, so he switched back to Vicodin. (*Id.*) Dr. Rafferty remarked:

> There really doesn't appear to be anything more we can do. He's been through a pain management program, PT. . . . He is in school and has a graduation date tentatively in a little bit less than a year. Hopefully, he can be self-employed so he doesn't have to sit in one spot at one time[] and can move about more readily.

(*Id.*) In August 1998, Dr. Rafferty wrote that Elwood's condition was "really stable," but he wanted Elwood to discuss surgical options with Dr. Dick again. (R. 527.) Dr. Rafferty noted that Elwood was attending school, but employment would "be a problem, because even though he will have a desk job, it is very difficult for him to sit for prolonged periods of time because of this accident and the disability." (*Id.*) Elwood saw Dr. Dick, as recommended, after which Dr. Rafferty commented that "[a]pparently he's not going to be a candidate for any further surgery." (R. 528.) Dr. Rafferty further remarked:

> He obviously has a permanent disability. I'm not sure what the percent is. It may be about 23% or something like

>  that . . . .  Presently his pain is managed with Vicodin . . . .
>  Diagnoses continue to be that of status quo lumbar fusion
>  anterior and posterior of L3-4 from 3-1/2 years ago and also
>  residuals of myofascial pain relating to the auto accident of
>  6/17/96.

(*Id.*)

Elwood told Dr. Rafferty in December 1998 that he planned to vacation in the
Dominican Republic the next month.  (R. 529.)  While on vacation, Elwood took Effexor,
which improved his mood and, in turn, helped him tolerate his pain better.  (R. 531.)
A few months later, however, Elwood discontinued taking Effexor because "it didn't do a
thing."  (R. 532.)  He continued to experience ongoing muscle spasms, chronic pain, and
tightness in his neck and back.  (*Id.*)  By September 1999, Elwood was experiencing
"excruciating pain" in his low back and left leg.  (R. 534.)  Dr. Rafferty recommended
another CT scan and physical therapy, but noted that additional back surgery would
probably not be an option.  (*Id.*)

Dr. Rafferty conducted a physical examination of Elwood on September 12, 2000.
(R. 508.)  Elwood reported continuing back pain, which Dr. Rafferty described as
"relatively stable."  (*Id.*)  Dr. Rafferty's treatment note contained no clinical findings or
functional limitations related to Elwood's back pain, however.  (*Id.*)  Although Elwood's
diverticulitis flared up about every two months, Cipro alleviated the symptoms in two
days.  (*Id.*)  Elwood reported increased, daily headaches in March 2001.  (R. 538.)
Dr. Rafferty recommended massage therapy for Elwood's head and neck pain, and noted
that other treatments such as epidural injections had proven ineffective.  (R. 539.)

In November 2001, Elwood told Dr. Rafferty he did not want to attend a pain management clinic because it was expensive and his insurance coverage had expired. (R. 541.)  Elwood was taking methadone and Percocet at that time to manage his pain. (*Id.*)  Dr. Rafferty described Elwood as "in a fair amount of discomfort right now," although he noted the examination was "unremarkable."  (R. 541-42.) Following an appointment the next month, Dr. Rafferty noted ongoing chronic back pain, diverticulitis, high blood pressure, and gastritis, although Elwood's chief complaint was intense dermatitis on his arms.  (R. 480.)

Dr. J. Kevin Croston treated Elwood for abdominal pain in February 2002. (R. 500.)  Elwood told Dr. Croston he worked in sales and "is also into racing cars."  (*Id.*) In April 2002, Elwood presented to Dr. Julie Samson with right shoulder pain.  (R. 408.) Dr. Samson wrote that Elwood was "quite active and owns his own business[,] and he would like to get back to his job as his job will be busiest in the fall."  (R. 409.)  Elwood told his physical therapist in June 2002 that he wanted to "get back to normal ASAP," and that he was self-employed and worked twenty hours a week.  (R. 423.)  On a medical history form, Elwood reported no difficulty getting in or out of a chair or a car, and able to balance on one or both feet, sit, use foot controls, dress, walk, run, bend, kneel, squat, lift, and carry.  (R. 424.)

## C.    Elwood's Public Employees Retirement Association Benefits

Elwood has received disability benefits through the Minnesota Public Employees Retirement Association (PERA) from May 16, 1995, through at least 2012.  (R. 283-341.) Dr. Dick initially submitted a Medical Disability Report on Elwood's behalf on May 8,

7

1995, when Elwood first applied.  (R. 352.)  Dr. Dick opined that Elwood's prognosis

was good and that he would be able to return to gainful employment.  (*Id.*)  Dr. Theodore

Palm, a Minnesota Department of Health medical consultant, reviewed Elwood's medical

records and issued an opinion on June 16, 1995, that Elwood would be "considerably

disabled for the next year and . . .  unable to return to his full work."  (R. 1826.)  Dr. Palm

recommended that Elwood be examined in one year for continuation of benefits.  (*Id.*)

Elwood's application for benefits was subsequently approved.  (R. 341.)

In September 1997, Dr. Rafferty completed an annual PERA report at Elwood's

request, noting:

> his present deterioration does persist since the auto accident
> of June 17, 1996.  That certainly did exacerbate his previous
> injuries.  He has ongoing low back pain.  He has had the
> previous surgery and also neck pain and will be seeing Dr.
> Dick . . . tomorrow.  Because of this, I don't think we need to
> repeat any exams.

(R. 521.)

Dr. Rafferty completed a PERA Physician Report/Continuation Process on

September 21, 1999.  (R. 327-29.)  He indicated that Elwood's condition had deteriorated

in the past month due to increased back pain with radiculopathy into the left buttock, and

indicated Elwood may need to return to physical therapy.  (R. 328.)  Dr. Rafferty opined

that Elwood was totally and permanently disabled from engaging in any substantial

gainful activity "other than cerebral work."  (R. 329.)

On October 20, 1999, Dr. James C. Mankey, a Minnesota Department of Health

medical consultant, issued a medical opinion for the purpose of continuing PERA

8

benefits.  (R. 320.)  Dr. Mankey opined that Elwood was totally and permanently

disabled, with a lifetime prognosis, due to his history of back injuries.  (*Id.*)  He also

recommended that future continuation requirements be waived.  (*Id.*)

### D.      Physical Residual Functional Capacity Opinion

Dr. Cliff M. Phibbs completed a physical residual functional capacity (RFC)

assessment on November 15, 2010, for the time period from June 30, 1995, through

September 30, 2001.  (R. 775-82.)  Dr. Phibbs noted a history of two spinal fusion

operations, and allegations of chronic pain, depression, PTSD, alcohol disorder, and

migraines.  (R. 775, 776.)  He described Elwood's course of treatment as conservative

and unremarkable, and noted that Elwood was able to ambulate without disability upon

discharge from his back surgery.  (R. 776.)  Based on the medical evidence of record,

Dr. Phibbs found that Elwood could lift twenty pounds occasionally and ten pounds

frequently; stand or walk for about six hours in an eight-hour workday; sit for about six

hours in an eight-hour workday; push and pull without limitation; frequently climb ramps

and stairs, balance, kneel, crouch, and crawl; and occasionally stoop and climb ladders,

ropes, and scaffolds.  (R. 776-77.)  Dr. Gregory Salmi reviewed all of the medical

evidence and affirmed Dr. Phibbs' assessment on March 1, 2011.  (R. 1498.)

### E.      The Administrative Hearing

The administrative hearing occurred on June 4, 2012, more than ten years after the

date Elwood was last insured.  Much of the testimony concerned Elwood's condition as it

existed at the time of the hearing.  The Court includes here only the testimony relevant to

the time period of June 30, 1995, through September 30, 2001.

Elwood testified that he first injured his back in 1992 while working as a heavy equipment operator.  (R. 41.)  He subsequently had two surgeries, the second of which was successful.  (R. 41.)  In June 1996, however, he injured his neck and reinjured his back in a motor vehicle accident.  (R. 41, 42.)  He has suffered from migraines and severe neck and back pain ever since.  (R. 41.)  Elwood also had carpal tunnel syndrome, H. pylori, and diverticulitis during the time period at issue.  (R. 42-43.)

On a typical day, Elwood would wake at 4:00 a.m., and then lie on the couch and watch television for most of the day.  (R. 44.)  His wife helped him dress and care for himself, and she did all the cooking and household chores.  (R. 45, 58.)  Elwood could sit for thirty to forty-five minutes at a time, stand for ten to fifteen minutes at a time, walk a block or two, and lift up to fifteen pounds.  (R. 51-52.)  His medications, Vicodin and methadone, effectively managed his pain.  (R. 55.)  Elwood explained that he waited so long to apply for DIB because he had learned only recently that benefits were available for disabled individuals.  (R. 62.)

Vocational expert Norman Mastbaum also testified at the hearing.  After hearing Elwood's testimony, the ALJ asked Mastbaum to consider

> a hypothetical individual of the claimant's age, education and work experience, which is limited to the full range of exertion of light work.  Individual should never climb ladders, ropes or scaffolds, but occasionally climb ramps or stairs, and could occasionally stoop, kneel, crouch, crawl or balance. Individual should also avoid concentrated exposure to the use of hazardous machinery, operational control of moving machinery, and unprotected heights.

(R. 67.)  Mastbaum testified that such an individual would not be able to perform

Elwood's past relevant work as a mechanic or heavy equipment operator, but could work

as a route deliverer, small product assembler, and warehouse checker or order picker.

(R. 67-68.)  If the person were limited to sedentary activity, rather than light work, he

could work as an optical goods packager, surveillance system monitor, machine bonder

tender operator, and loader packager or assembler.  (R. 69.)  A sit/stand at-will option

would be available for most of the sedentary occupations.  (R. 70.)

### F.      The ALJ's Decision

In a written decision dated September 19, 2012, the ALJ determined that Elwood

was not disabled.  (R. 12.)  Following the five-step sequential analysis outlined in

20 C.F.R. § 404.1520, the ALJ first determined that Elwood had not engaged in

substantial gainful activity between June 30, 1995, and September 30, 2001.  (R. 14.)

*See* 20 C.F.R. § 404.1520(b).  The ALJ determined at the second step that Elwood

suffered from the following severe impairments: back disorder, chronic pain syndrome,

and alcohol dependence.  (*Id.*)  *See* 20 C.F.R. § 404.1520(c).

At the third step, the ALJ found that Elwood did not have an impairment or

combination of impairments that met or medically equaled the severity of an impairment

listed in 20 C.F.R. part 404, subpart P, appendix 1.  (R. 15.)  *See* 20 C.F.R.

§ 404.1520(d).  The ALJ specifically considered listings 1.02 and 1.04.  (*Id.*)  With

respect to listing 1.04, the ALJ found that the "record failed to demonstrate persistent

nerve root compression with associated motor loss, spinal arachnoiditis, or lumbar spinal

stenosis resulting in the claimant being unable to ambulate."  (*Id.*)  *See* 20 C.F.R. pt. 404,

subpt. P, app. 1, § 1.04.A.  Elwood did not meet listing 1.02 because he could ambulate

effectively and perform fine and gross movements.  (*Id.*)  *See* 20 C.F.R. pt. 404, subpt. P,

app. 1, § 1.02.  Because Elwood did not have an impairment or combination of

impairments that met or medically equaled the severity of a listed impairment, the ALJ

proceeded to the fourth step of the analysis.

At the fourth step, the ALJ assessed Elwood's RFC as follows:

> to perform light work as defined in . . . [§] 404.1567(b)
> except that he could never climb ladders, ropes and scaffolds,
> and could only occasionally climb ramps or stairs.  In
> addition, the claimant could only occasionally stoop, kneel,
> crouch, crawl, and balance.  Finally, the claimant needed to
> avoid concentrated exposure to the use of hazardous
> machinery, operational control of moving machinery, and
> unprotected heights.

(R. 16.)  The ALJ found that Elwood's reported pain was largely inconsistent with

diagnostic testing and imaging results, examination findings, the relatively conservative

course of treatment prescribed by his doctors, his daily activities, and his compliance

with treatment.  (R. 16-17.)  The ALJ noted that after Elwood's back surgery in May

1995, his pain symptoms improved significantly, and he walked three miles a day.

(R. 16.)  Over the next year, Elwood complained only of right hip pain, and diagnostic

imaging revealed only minimal degenerative joint disease in the hip.  (*Id.*)

The ALJ acknowledged in his decision that the 1996 motor vehicle accident

aggravated Elwood's back pain.  (*Id.*)  Although Elwood reported increased neck pain,

headaches, and severe back pain radiating into his left leg, diagnostic imaging showed

that his neck and back were normal, his spinal fusion was solid, and he had no fractures.

(R. 17.)  Over the next few months, Elwood reported greater pain and increased his intake of Vicodin to six a day, but he also ceased chiropractic care and reported he was independent in his activities of daily living, drove a car for up to an hour at a time, and could carry fifteen pounds.  (*Id.*)  The ALJ noted Elwood's counselor's comment in January 1997 that Elwood was seeking a "quick fix" and was not committed to rehabilitation.  (*Id.*)  Over the next few years, the ALJ observed, Elwood continued to complain of pain, but his doctors found that Vicodin effectively managed the pain, physical examinations were unremarkable, and few functional restrictions were imposed. (*Id.*)  In addition, Elwood attended a vocational school and earned a degree, and shortly after his date last insured, owned his own business and had no physical limitations. (R. 19.)

The ALJ gave little weight to Dr. Rafferty's opinion that Elwood was permanently disabled, finding it inconsistent with treatment records and clinical testing.  (R. 17.)  On the other hand, the ALJ gave great weight to the opinion of Dr. Phibbs that Elwood could perform light work with some postural limitations.  (R. 17-18.)  Specifically, the ALJ noted that Elwood's symptoms were managed effectively with conservative treatment, and he was able to ambulate without difficulty.  (R. 18.)  The ALJ afforded Dr. Phibbs' opinion great weight because the opinion was consistent with Elwood's medical records, Dr. Phibbs provided support for his conclusions, and Dr. Phibbs was familiar with the Social Security Administration's disability rules and regulations.  (*Id.*)

Based on Elwood's RFC, the ALJ determined at step four that Elwood could not have performed any of his past relevant work as an automobile mechanic or heavy

equipment operator.  (R. 19.)  At the fifth and final step, the ALJ relied on Mastbaum's

testimony to find that Elwood could have worked as a route delivery driver, small

products assembler, or order picker.  (R. 20-21.)  Thus, Elwood was not disabled.

(R. 21.)

## II.     Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to determining

whether substantial evidence on the record as a whole supports the decision. 42 U.S.C.

§ 405(g).  "Substantial evidence is less than a preponderance but is enough that a

reasonable mind would find it adequate to support the Commissioner's conclusion."

*Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Prosch v. Apfel*,

201 F.3d 1010, 1012 (8th Cir. 2000)).  The Court must examine "evidence that detracts

from the Commissioner's decision as well as evidence that supports it."  *Id.* (citing *Craig

v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000)).  The Court may not reverse the ALJ's

decision simply because substantial evidence would support a different outcome, or even

if the Court would have granted benefits.  *Id.* (citing *Woolf v. Shalala*, 3 F.3d 1210, 1213

(8th Cir. 1993)).  If it is possible to reach two inconsistent positions from the evidence,

and one of those positions is that of the Commissioner, the Court must affirm the

decision.  *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992).

## III.    Discussion

Elwood argues that Commissioner's decision should be reversed on the following

grounds: (1) the ALJ failed to obtain an opinion from a medical expert on the issue of

equivalence; (2) Elwood's combined impairments medically equal the criteria of listing

1.04 of 20 C.F.R. part 404, subpart P, appendix 1; (3) the ALJ failed to give controlling weight to Dr. Rafferty's RFC opinion of September 22, 1998; (4) the ALJ substituted his own opinion for that of Elwood's treating physician; and (5) the ALJ's hypothetical question to the vocational expert did not accurately describe Elwood's limitations and functional abilities.

### A.     Expert Opinion Evidence on the Issue of Equivalence

Elwood faults the ALJ for failing to obtain an opinion from a medical expert on the issue of equivalence, specifically whether the combination of Elwood's back and neck pain, carpal tunnel syndrome, H. Pylori, gastritis, and severe headaches medically equaled a listed impairment.

An ALJ decides whether a claimant's impairments are medically equivalent to a listed impairment at step three of the sequential evaluation. *Carlson v. Astrue*, 604 F.3d 589, 592 (8th Cir. 2010).  When an individual claims his impairments are "equivalent in severity to any impairment in the Listing of Impairments," Social Security Ruling (SSR) 96-6p requires "that the judgment of a physician . . . designated by the Commissioner on the issue of equivalence on the evidence before the administrative law judge or the Appeals Council must be received into the record as expert opinion evidence and given appropriate weight."  SSR 96-6p, 1996 WL 374180, at *3 (Soc. Sec. Admin. 1996). "State agency medical and psychological consultants are highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the Act," and their judgment on the issue of medical equivalence must be received as expert opinion evidence. *Id.* at *2, 3.

15

At the initial review and reconsideration stages, the signature of a state consultant on a Disability Determination and Transmittal Form "ensures that consideration by a physician . . . designated by the Commissioner has been given to the question of medical equivalence." *Id.* at *3. A signed Disability Determination and Transmittal Form can also satisfy the ALJ's burden "to receive expert opinion evidence into the record." *Id.*; *Carlson*, 604 F.3d at 593.

In the present case, the Disability Determination and Transmittal Forms reflect that a state agency medical consultant reviewed Elwood's medical records, noted a primary diagnosis of a back disorder and secondary diagnoses of "[o]ther and unspecified arthropathies," and determined that Elwood was not disabled by his impairments. (R. 74, 75.) These forms provided sufficient expert opinion evidence on the issue of medical equivalence. *See* SSR 96-6p, 1996 WL 374180, at *3.

Moreover, the ALJ specifically considered a signed RFC assessment in which Dr. Phibbs considered evidence of Elwood's back impairment, pain, depression, PTSD, alcohol disorder, and migraines. (R. 17, 776.) Consideration of a signed RFC form also fulfilled the ALJ's duty to receive an expert opinion on the issue of equivalence. *See Carlson*, 604 F.3d at 593 ("The ALJ's consideration of Dr. Staples's signed RFC assessment satisfied the obligation to receive an expert opinion on equivalence.").

An ALJ must obtain an *updated* opinion from a medical expert only in the following two circumstances:

> \* When no additional medical evidence is received, but in the opinion of the administrative law judge or the Appeals Council the symptoms, signs, and laboratory findings

> reported in the case record suggest that a judgment of
> equivalence may be reasonable; or
>
> * When additional medical evidence is received that in the
> opinion of the administrative law judge or the Appeals
> Council may change the State agency medical or
> psychological consultant's finding that the impairment(s) is
> not equivalent in severity to any impairment in the Listing of
> Impairments.

SSR 96-6p, 1996 WL 374180, at *4.  In either of these situations, "the administrative law

judge must call on a medical expert."  *Id.*

But neither of these circumstances occurred in Elwood's case.  The ALJ did not

opine that the medical record suggested a finding of equivalence was reasonable.  Nor did

the ALJ receive additional medical evidence that, in his opinion, changed the state

consultant's finding that the impairment was not equivalent to a listed impairment.

Accordingly, the ALJ was not required to obtain an updated opinion on medical

equivalence.

**B.    Whether Elwood's Impairments Medically Equaled Listing 1.04.A**

Elwood next argues that the ALJ did not consider his back, neck, pain, carpal

tunnel syndrome, H. Pylori, gastritis, and severe headaches in combination at step three.

If the ALJ had, Elwood submits, the combination of these impairments would medically

equal listing 1.04.A.

> Listing 1.04.A provides as follows:
>
> Disorders of the spine (e.g., herniated nucleus pulposus,
> spinal arachnoiditis, spinal stenosis, osteoarthritis,
> degenerative disc disease, facet arthritis, vertebral fracture),
> resulting in compromise of a nerve root (including the cauda
> equina) or the spinal cord.  With:

17

> A.  Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine) . . . .

20 C.F.R. pt. 404, subpt. P, app. 1, § 1.04.  Stated another way, to meet the listing, a claimant must show evidence of (1) a spine disorder, (2) that results in compromise of a nerve root or spinal cord, *and* (3) evidence of nerve root compression characterized by neuro-anatomic distribution of pain, *and* limited motion of the spine, *and* motor loss accompanied by sensory or reflex loss, *and* a positive straight-leg raising test *if* there is involvement of the lower back.

A claimant has the burden to demonstrate "that his impairment matches *all* the specified criteria of a listing."  *McDade v. Astrue*, 720 F.3d 994, 1001 (8th Cir. 2013) (emphasis added).  When a claimant does not present evidence satisfying each criterion, he has not met his burden.  *Id.* ("Here, although McDade presents some evidence that he satisfies Listing 1.04, such as evidence of spinal stenosis, he provides no evidence that his spinal injury resulted in compromise of the nerve root or the spinal cord, which is a requirement for all conditions within Listing 1.04."); *Carlson v. Astrue*, 604 F.3d 589, 594 (8th Cir. 2010) (quoting *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990)) (requiring the claimant to "present medical findings equal in severity to all the criteria for the one most similar listed impairment").  An ALJ need not explain why an impairment does not equal a listed impairment, as long as the conclusion is supported by the record.  *Boettcher v. Astrue*, 652 F.3d 860, 863 (8th Cir. 2011).

Elwood concedes that his "symptoms may not exactly match what is required" under listing 1.04.A, but nonetheless argues that his neck pain, severe headaches, gastritis, H. pylori, and carpal tunnel syndrome, and back pain medically equaled the listing. (Pl.'s Mem. Supp. Mot. Summ. J. at 16-17.) Essentially, he argues that the ALJ should have substituted these symptoms for required criteria. The Court disagrees.

The ALJ determined that Elwood did not meet or medically equal the required criteria of listing 1.04, because there was no evidence of "persistent nerve root compression with associated motor loss, spinal arachnoiditis, or lumbar spinal stenosis resulting in the claimant being unable to ambulate." (R. 15.) Elwood does not argue otherwise. Nerve root compression characterized by motor loss is a requirement of listing 1.04.A. It cannot be replaced by pain, headaches, gastritis, or any of Elwood's other alleged symptoms, regardless of their severity. Consequently, Elwood has not met his burden to establish that the combination of his impairments is medically equivalent to listing 1.04.A.

### C.    Dr. Rafferty's RFC Opinion

Dr. Rafferty opined on September 22, 1998, that Elwood "obviously has a permanent disability," but he was "not sure what the percent is. It may be about 23% or something like that." (R. 528.) Elwood argues the ALJ should have given this opinion controlling weight, because it was based on Dr. Rafferty's observations and treatment of Elwood for many years and was supported by clinical and laboratory findings. Relatedly, Elwood contends that the ALJ failed to identify an examining medical source who offered an opinion inconsistent with Dr. Rafferty's.

A claimant's RFC "is the most [he] can do despite [his] limitations." 20 C.F.R.
§ 404.1545(a)(1).  The ALJ must consider all relevant medical and other evidence in
making this determination.  § 404.1545(a)(1), (3).  If "a treating source's opinion on the
issue(s) of the nature and severity of your impairment(s) is well-supported by medically
acceptable clinical and laboratory techniques and is not inconsistent with the other
substantial evidence in your case record," the ALJ must afford the opinion controlling
weight.  20 C.F.R. § 404.1527.  The ALJ need not accept an opinion that fails to meet
these criteria, however.  *Davidson v. Astrue*, 578 F.3d 838, 842 (8th Cir. 2009).

The ALJ correctly denied controlling weight to Dr. Rafferty's opinion because it
was not supported by clinical or diagnostic findings, and it was inconsistent with other
substantial evidence in the record.  As noted by the ALJ, Elwood reported that he was
independent in light activities of daily living, could drive a car for up to an hour, could
carry fifteen pounds, and traveled to the Dominican Republic.  Just a few months after
the 1996 accident, Elwood's gait was normal, and he had full strength in his lower
extremities.  Physical examinations by Dr. Rafferty, Dr. Dick, and Dr. Belfanz were
generally unremarkable, revealing only mild tenderness, slight limitations in range of
motion, no radicular symptoms, and no spasms.  By contrast, many of Elwood's
appointments with Dr. Rafferty did not include a physical examination at all.  Neither
Dr. Dick nor Dr. Belfanz found Elwood permanently disabled or imposed functional
restrictions, and their clinical findings and test results were consistent with the ALJ's
RFC.  Diagnostic tests and imaging such as x-rays, an MRI scan, CT scans, and an
electromyography study were normal, and Elwood's spinal fusion was solid.

The ALJ was entitled to reject Dr. Rafferty's opinion on another basis as well. "[A] treating physician's opinion that a claimant is disabled or unable to work, does not carry any special significance . . . because it invades the province of the Commissioner to make the ultimate determination of disability." *Id.* (internal citation and quotation marks omitted); 20 C.F.R. § 404.1527(d)(1) ("We are responsible for making the determination or decision about whether you meet the statutory definition of disability. . . . A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."). The Court finds here that the ALJ was not obliged to give controlling weight to Dr. Rafferty's opinion that Elwood was disabled. This opinion on the ultimate question of disability clearly invaded the Commissioner's authority, and the ALJ was right to reject it on this basis alone.

### D. Whether the ALJ Erroneously Substituted His Own Opinion for That of Elwood's Treating Physician

Elwood claims the ALJ erred by substituting his own opinion for that of Dr. Rafferty. But it is the ALJ, not the treating physician, who is tasked with evaluating a claimant's RFC. *See Krogmeier*, 294 F.3d at 1023; 20 C.F.R. § 404.1546(c). The ALJ must assess a claimant's RFC "based on all of the relevant medical and other evidence." 20 C.F.R. § 404.1545(a)(3). Because RFC is essentially a medical question, however, the ALJ must ensure that the record contains "medical evidence that addresses the claimant's ability to function in the workplace." *Krogmeier*, 294 F.3d at 1023 (quoting *Hutsell v. Massanari*, 259 F.3d 707, 712 (8th Cir. 2001)). Such evidence may include an RFC

opinion by a non-examining, consulting physician.  *See* 404 C.F.R. §§ 404.1512(b)(8),

404.1513(c), 404.1527(e)(2).

Dr. Phibbs, a non-examining consulting physician, completed an RFC assessment

form and found that Elwood had certain exertional limitations but could perform light

work.  The ALJ afforded Dr. Phibbs' opinion great weight because it was consistent with

and well-supported by Elwood's medical records, and Dr. Phibbs was familiar with the

Social Security Administration's disability rules and regulations.  Under 20 C.F.R.

§ 404.1527(e)(2)(ii), an ALJ may assign great weight to the opinion of a non-examining

consultant for these very reasons.  The ALJ did not err in finding Dr. Phibbs' opinion

supported by substantial evidence in the record.  Such evidence included Elwood's

conservative course of treatment and his ability to ambulate without difficulty, walk ten

to fifteen minutes at a time, reach without limitation, carry fifteen pounds for twenty feet,

care for himself, perform light activities independently, and drive up to an hour at a time.

Elwood submits that Dr. Phibbs' opinion, standing alone, could not constitute

substantial evidence on which to base a decision.  While this is true, the ALJ did not rely

solely on Dr. Phibbs' opinion in assessing Elwood's RFC.  The ALJ considered all of the

relevant medical and other evidence of record, including Dr. Phibbs' opinion, as allowed

by §§ 404.1527(e)(2)(ii) and 404.1545(a)(3).

In sum, an ALJ's "independent review of the medical evidence" is not only

allowed, but required.  *See Krogmeier*, 294 F.3d at 1024; 20 C.F.R. § 404.1546(c).  Here,

the ALJ considered Elwood's treatment records, Dr. Phibbs' opinion, and Elwood's

testimony and self-described limitations, as well as the absence of clinical findings

supporting Dr. Rafferty's opinion, in arriving at Elwood's RFC.  The Court concludes

that the ALJ's decision was supported by substantial evidence in the record.

### E.    The Hypothetical Question Posed to the Vocational Expert

Elwood contends the hypothetical question posed to the vocational expert at the

hearing was inaccurate because it did not incorporate Dr. Rafferty's RFC.  A vocational

expert's testimony "constitutes substantial evidence only when based on a properly

phrased hypothetical question."  *Tucker v. Barnhart*, 363 F.3d 781, 784 (8th Cir. 2004).

A hypothetical question must include all impairments supported by substantial evidence

in the record as a whole and accepted as true by the ALJ.  *Id.*; *Rappoport v. Sullivan*,

942 F.2d 1320, 1323 (8th Cir. 1991)).  The Court has determined that the ALJ properly

rejected Dr. Rafferty's opinion, gave great weight to the opinion of Dr. Phibbs, and

properly assessed Elwood's RFC.  The hypothetical question framed by the ALJ included

the impairments accepted as true by the ALJ.  Accordingly, the vocational expert's

testimony constituted substantial evidence on which the ALJ could base his decision.

## IV.    Recommendation

Although at first blush it may seem incongruous for the ALJ to have found

Elwood ineligible for DIB benefits during the time he was receiving PERA benefits, there

is substantial evidence in the record as a whole to support the ALJ's decision.

Dr. Rafferty's opinion that Elwood was disabled was entitled to no weight.  The opinion

was also inconsistent with other evidence and not supported by clinical assessments and

laboratory tests.  On the other hand, records from Elwood's other medical providers and

Elwood's own descriptions of his symptoms and limitations provided support for the

23

ALJ's decision.  Finally, the ALJ was not under a duty to obtain evidence from an expert on the issue of medical equivalence.

Accordingly, **IT IS HEREBY RECOMMENDED** that:

1.      Andy LeRoy Elwood's Motion for Summary Judgment [Doc. No. 13] be

**DENIED**;

2.      The Commissioner's Motion for Summary Judgment [Doc. No. 20] be

**GRANTED**; and

3.      **JUDGMENT BE ENTERED ACCORDINGLY**.


Dated:  December 8, 2014                     _s/ *Hildy Bowbeer*_____
                                            HILDY BOWBEER
                                            United States Magistrate Judge


## NOTICE

Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **December 23, 2014**, a writing that specifically identifies those portions of this Report to which objections are made and the basis of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  A party may respond to the objecting party's brief within fourteen days after service thereof.  A judge shall make a de novo determination of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.